UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GIOVANNI LARA,<br>Petitioner, | : | |
| v. | : | Civil Case No. ________<br>(Criminal No. 00-554 ML) |
| UNITED STATES of America,<br>Respondent. | : | |

**MOTION TO REOPEN AND SUPPLEMENT ORIGINAL FILED MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255**

This memorandum of points and authorities in support of the accompanying motion to reopen and supplement original motion to vacate sentence pursuant to 28 U.S.C. § 2255 et seq., submitted by Giovanni Lara (hereinafter, "Petitioner"), pro se in the abovestyled matter asserts that a writ of habeas corpus should be issued in that he is being continuously

deprived of the rightful liberty by virtue of a violation of his constitutional rights.

As such, the Petitioner respectfully states that this action does have merit. And having exhausted all other available means or remedies, in respect to the instant petition, Petitioner is left with no other alternative than to seek collateral relief from the violations presented herein which he, in good-faith, represents a level of constitutional infirmity that authorizes this Court today to accept this action for review. That is, the United States Supreme Court and Circuit courts have recently issued a series of opinions which directly impact the convictions and sentences in this case.

These issues were not recognized at the time of Petitioner's trial, and during the filing of his habeas corpus, therefore, becoming unavailable for inclusion therein. Thus, these issues should be heard to prevent a further manifest injustice. In support of the instant motion, Petitioner respectfully states as follows:

## JURISDICTION

This Court has jurisdiction in this cause of action pursuant to Rule 60(b), Federal Rules of Civil Procedures, which has been defined in Klapprott v. United States, 335 U.S. 601 (1949)("[P]ower in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."). Id. at 615.

And in the alternative, this motion may further be considered under a writ of error coram nobis, which is a viable tool to accomplish such justice as this situation seeks where the sentencing court did not have authority to impose a mandatory sentence. See Trenkler v. United States, No. 06-12072-RWZ (D. Mass. Feb. 20, 2007)(attached copy enclosed hereto). The writ is an "extraordinary remedy [available] only under circumstances compelling such actions to achieve justice." United States v. Morgan, 346 U.S. 502, 511 (1954). The writ of error coram nobis provides a remedy to correct "errors of the most fundamental character" that have occurred in a criminal proceeding. Id. at 512.

The specific facts of this case — including the collective misinterpretation of the statute by all parties

and the late discovery of correct interpretation, the subsequent acceptance of that interpretation by the government weighing strongly in favor of collateral review here, in order to ultimately prevent a "complete miscarriage of justice."

## PRELIMINARY STATEMENT

> "[W]ere no other avenue of judicial review is available for a party who claims that s/he is factually or legally innocent as a result of a previously unavailable statutory interpretation, [the court] would be faced with a thorny constituional issue."

In Re Dorsainvil, 119 F.3d 245, 248 (3rd Cir. 1997).

Any distinction between innocence of the underlying crime and innocence of the crime used to enhance a sentence is unavailable because "[I]n both instances, a petitioner is being held in contravention of the laws of the United States. In one scenario, the petitioner is imprisoned for conduct for which she is innocent; in the other scenario, she is imprisoned longer because of conduct of which she is innocent. In either event, her liberty is stripped." Gonzalez v. United States, 135 F.Supp2d 112, 121-22 (D. Mass. 2001).

## A. JUDGMENT

The judgment is void if the court who rendered it lacked jurisdiction of the subject - matter or personal jurisdiction, or if it acted in a matter inconsistent with due process of law. Hoult v. Hoult, 57 F. 3d 1, 6 (1st Cir. 1995). The judgment here is void because the court acted in a matter inconsistent with due process of law when it sentenced Petitioner to a mandatory life sentence without parole under an unproven 18 U.S.C. § 2119(3). The government may satisfy the intent element of § 2119 if it proves beyond a reasonable doubt that the defendant had a conditional intent to cause death or serious bodily harm to a victim. United States v. Holloway, 526 U.S. 1, 3, 7 (1999);and Jones v. United States, 526 U.S. 227 (1999) (Federal carjacking statute (18 U.S.C. § 2119, later amended) held to define three separate offenses by specification of distinct elements, rather than to define single crime with choice of three maximum penalties); In Re Winship, 397 U.S. 358, 364 (1970)(Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt) doubt); See Blakely v. Washington, 124 S. Ct. 2531, 2542; 542 U.S. 296, 304 (2004) (holding that "[A] sentenceing judge exceed his proper authority when he inflicts punishment

that the jury's verdict alone does not allow, as the jury has not found all the facts which the law makes essential to the punishment").

B. STATUTORY JURISDICTION

The term jurisdiction refers to the court's authority to issue a specific type of punishment rather than its subject — matter jurisdiction to hear the case. See 18 U.S.C. § 3231. This statute does not provide a roving grant of authority to punish all federal crimes that district courts may encounter. Were it so, a defendant would be placed in jeopardy for all federal crimes when tried for any federal crime[s]. Rather, the statute confers jurisdiction on district courts "to render judgment on the indictment." United States v. Williams, 341 U.S. 58, 66 (1958). "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." Bender v. Williamsport Area School District, 475 U.S. 534, 541 (1986). Thus, every federal court has a special obligation to "satisfy itself of its own jurisdiction in a cause under review" even though the parties are prepared to concede to it. Mitchell v. Maurer, 293

U.S. 237, 244 (1934).

When a district court does not have statutory jurisdiction over the underlying action "[I]ts process[es] [are] void and an order of [punishment] based [thereupon]... must be reversed." ("[T]he [punishment] order itself should fall with a showing that the court was without authority to enter the decree."). Willy v. Coastal Corp., 503 U.S. 131, 139 (1992); see also Ex parte Fisk, 113 U.S. 713, 718 (1885)("When a court of the United States undertakes, by its process...to punish a man...[respecting] an order which that court has no authority to make, the order itself, being without jurisdiction, is void and the order punishing... is equally void.").

A court "has jurisdiction to render a particular judgment only when the offense charged is within the class of offenses placed by the law under its jurisdiction." Bowen v. Johnson, 306 U.S. 19, 24 (1939). Thus, if it is found that the court lacked statutory jurisdiction for a particular offense, the judgment is void because the court lacked jurisdiction, and the judgment must be vacated. This is precisely the function of a habeas corpus, i.e., to "examin[e]...the jurisdiction of the court whose judgment of conviction is challenged."), Bowen, supra,

at 24, and where, as here, the court was clearly "without jurisdiction...the Petitioner...must be discharged." Ex parte Yarbrough, 110 U.S. 651, 654 (1884).

### C. LEGAL STANDARD FOR VOID JUDGMENT

"[B]asic to a defendant's right [is] to have all critical stages of a criminal case conducted by a person with jurisdiction to proceed." Gomez v. United States, 490 U.S. 858, 876 (1989). Since the Petitioner here brings this petition pursuant to the constituional right in demanding relief under the doctrine of habeas corpus and challenges the court's jurisdiction to: indict; sentence; and convict him, thus, **no procedural hurdle exists and no time bar exists**. United States v. Peter, 310 F.3d 709, 715 (11th Cir. 2002)(emphasis added). And because Petitioner's claims are jurisdictional, no valid plea, nor waiver, jury verdict, or sentencing exists as a matter of law. Therefore, Petitioner has a due process right to raise these claims, and a due process right to be released from his unlawful constraints. Jurisdiction, is a threshold issue and may be raised at any time.

No time limit exists for attacking a void judgment.

Briley v. Hidalgo, 981 F.2d 246, 249 (5th Cir. 1993). Imprisonment under a void order is without authority of law and one is imprisoned will be discharged on habeas corpus. Fay v. Noia, 372 U.S. 414, 423 (1963).

In sum, Petitioner is entitled to relief from the judgment and orders of the district court on his habeas petition because evidence exists **beyond a reasonable doubt** that the judgment and orders were obtained in violation of due process; were obtained in violation of the Constitution and laws of the United States; were obtained by **misinterpretation of statute** */; and were obtained in excess of the court's jurisdiction, thus, rendering any judgment and orders **void** as a **matter of law**. Emphasis added. The misinterpretation of statute and constitutional violations prevented Petitioner from previously raising claims on the merits and deprived him of his access to the courts, and the **right to prove his innocence** and be free from unlawful constraints.

---

*/. Cf. Bousley v. United States, 523 U.S. 614, 626 (1998) (The fact that all of [Petitioner's] advisors acted in good-faith reliance on existing precedent does not mitigate the impact of that erroneous advice. Its consequences for Petitioner were just as unfair, as if the court and counsel had knowingly conspired to deceive him in order to induce him to plead guilty to a crime that he did not commit.). Id. at 626.

## PROCEDURAL HISTORY

Petitioner and ten co-defendants were indicted on September 21, 1995, by a federal grand jury in the District of Rhode Island. A thirteen count superseding indictment was filed on March 27, 1996, charging Petitioner with participating in a racketeer influenced corrupt organization ("RICO"), count one; conspiracy to commit RICO, count two; committing a violent crime in aid of racketeering ("VCAR"), count three; carjacking, count eight; witness intimidation, count nine; and possession of a firearm by a convicted felon, count ten.

After a forty-four day trial, Petitioner was convicted of carjacking and witness intimidation on October 8, 1997. The court sentenced Petitioner to a term of life imprisonment without the possibility of parole on count eight, and a concurrent term of ten years imprisonment on count nine.

Petitioner filed a timely appeal to the First Circuit court of appeals. Petitioner's conviction and sentence were affirmed. See United States v. Lara, 181 F.3d 183 (1st Cir. 1999).

## RELEVANT FACTS

On the evening of September 6, 1994, Petitioner and George Perry asked Temujin Vandergroen to give them a ride in his car. Perry brought along a 16-gauge sawed-off shotgun. See Appendix ("App.") at 66-67. Petitioner sat in the front passenger seat while Perry remained at the back seat of the vehicle behind Vandergroen. App. at 63. Perry directed Vandergroen to drive to a desolated area on West River Street in Providence. When Vandergroen slowed the car at Perry's instruction, Perry shot him once at the back of the head. Vandergroen's body was pushed out of the vehicle and left at the middle of the streets, where it was discovered thereafter shortly. App. at 68-69. Perry and Lara drove Vandergroen's car back to the Dog Pound* where it was observed that the pair had blood on their clothing. App. at 132-133. Petitioner stated that the shooting was an accident and that they were only supposed to steal the car rims. App. at 144.

Petitioner was arrested on other charges shortly after the carjacking and murder of Vandergroen. Petitioner met Manuel Pacheco at the Adult Correctional Center and volunteered the foregoing version of events with Pacheco.

* A social night club for members of the Latin Kings.

App. at 63-70.

Following Perry's arrest on February 25, 1995, hence, waiving his Miranda rights and signed a written confession. App. at 85-88. Perry admitted that he only intended to steal Vandergroen's vehicle. Perry further confessed pointing the 16-guage shotgun at Vandergroen's head while at the back seat directly behind the driver's seat. However, Perry stated that the shotgun accidently discharged when Vandergroen swung his arm around to hit the weapon away from Perry. Id. Perry also admitted giving the shotgun to Petitioner to dispose of. **1/**.

At trial, Perry and Petitioner testified that: 1) Petitioner had no prior knowledge of a planned robbery or carjacking beforehand; 2) Petitioner had no knowledge Perry had a gun in the car; 3) Petitioner did not assist with disposing Vandergroen's body, the saw-off shotgun, and/or the vehicle used after the carjacking. See App.

---

**1/**. At trial, however, Perry testified of personally disposing the sawed-off shotgun.

151-153, 155, 164-169. Moreover, Perry clearly testified Vandergroen's car and its nice rims was the object of his desire. App. at 154(a)(b)(c), 155(a), and 151(a).

After hearing this evidence, the jury was given the following instructions:

> "Count eight of the indictment charges that 'on or about September 6, 1994, in the District of Rhode Island, defendants Perry and [Petitioner], while possessing a firearm, did knowingly, intentionally, and unlawfully take a motor vehicle that had been transported, shipped and received in interstate and foreign commerce, that is, a 1994 Ford Escort, vehicle identification number 3FARP13JZRR109303, from the person and presence of Termujin Vandergroen, by force and violence, and during the course of that offense the death of Temujin Vandergroen did result, in violation of Titl 18 Section 2119(3) and Section 2 of the United States Code.'" See App.
>
> "The defendants can be found guilty of violating Section 2119 only if the government proves the following four elements beyond a reasonable doubt:
>
> (1) That the defendants took from the person or presence of Temujin Vandergroen a motor vehicle;
>
> (2) That the defendants did so by means of force or violence;
>
> (3) That the motor vehicle taken had previously been transported, shipped or received in interstate or foreign commerce; and
>
> (4) That a firearm was possessed by one or more of the defendants during the commission of the crime." 2/.

---

2/. Here, it is important to note the jury found Petitioner not guilty of the use of a firearm during the commission of this crime. Thus the jury could have further found the death of Temujin Vandergroen was not foreseeable to Petitioner. Moreover, Petitioner was also acquitted of count III, committing a violent crime in aid of racketeering ("VCAR")(The murder of Temujin Vandergroen).

Petitioner's conviction and sentence was affirmed and his judgment became final on November 1, 1999. Thereafter, Petitioner filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. As relevant to the instant petition, Petitioner alleged the following issue(s): (1) subsection [3] of the federal carjacking statute was not submitted to the jury for its verdict; (2) that Petitioner was actually innocent where his sentence exceeded the statutory maximum for a single crime of carjacking; and (3) appellate counsel was ineffective in failing to raise on direct appeal Petitioner's substantive rights to a unanimous verdict was violated where the jury returned a general verdict.

In denying Petitioner's challenge of the validity of his conviction on count eight, this Court stated, in relevant part, Petitioner's "reliance on Apprendi is misplaced...is not retroactively applicable on collateral review." See Memorandum and Order, at 8. "Assuming, arguendo, that either trial or appellate counsel, or both, performed deficiently in not pursuing a challenge to the absence of a specific jury determination of the "death resulting" element of § 2119(3)," Petitioner has not satisfied Strickland's "prejudice" requirement. Id. at 10.

## DISCUSSION

While the court did not have the authority to sentence Petitioner to a mandatory life imprisonment on the car-jacking count under the expressed language of the statute, neither the government, nor defense counsel presented this fact to the court's attention at the time. Even the U.S. Probation Office, in compiling the presentence report, incorrectly asserted that life imprisonment was an option available to the sentencing court.

On the date of offense described in Count Eight was committed, 18 U.S.C. § 2119 provided as follows:

> "Whoever possess a firearm as defined in Section 921 of this Title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force or violence or by intimidation, or attempts to do so, shall —
>
> (1) be fined under this Title or imprisoned not more than 15 years, or both,
>
> (2) if serious bodily injury (as defined in Section 1365 of this Title) results, be fined under this Title or imprisoned not more than 25 years, or both, and
>
> (3) if death results, be fined under this Title or imprisoned for any number of years up to life, or both.

18 U.S.C. § 2119 (1994).

In Jones v. United States, 526 U.S. 227 (1999), the Supreme Court interpretated the federal carjacking statute (stated above), which prohibits taking a motor vehicle from the person of another by force or violence. The statute first defines the criminal conduct, and then provides three separate subsections setting forth distinct punishments (as shown above). Despite the apparent division of the statute into violation — defining and penalty — describing portions, despite the fact that the sentence — enhancing elements are contained in penalty provisions and not in separate code sections expressly defining distinct crimes. The Supreme Court recognized that the statute created three distinct degrees of crime, and that a defendant must be proven beyond a reasonable doubt, to the satisfaction of a jury, to have caused the sentence — enhancing harm, before the court can impose the enhanced punishment(s) for the higher degree of carjacking. Therefore, absent the requisite proof of **"serious bodily injury"** or **"death"**, a defendant convicted under Section 2119 was subject to a maximum term of 15-years of imprisonment specified in subsection (1). Id. at 251-52.

Contrary to the government's position at sentencing, this statute is not analogous to a felony murder statute. See United States v. Rosario-Diaz, 202 F. 3d 54, 63 ( 1st Cir. 2000 ) holding that "[C]arjacking is a

specialized offense, requiring a specific criminal act and a narrow mens rea."). Even "if death results," the statute requires "intent to cause death or serious bodily harm." A felony murder statute is defined by the absence of any such intent element. For instance, 18 U.S.C. § 1111, defines a homicide as first-degree murder if it was "committed in the perperation of...robbery." The federal robbery statute, 18 U.S.C. § 2111, contains no requirement that the perpetrator intended to inflict bodily injury or death. Therefore, under the federal felony — murder rule, a defendant can be convicted of first-degree murder even though he never intended to inflict physical harm on the victim. That is not the case under the carjacking statute. United States v. Matos-Quinones, 456 F.3d 14, 17-18, n. 2 (1st Cir. 2006).

Accordingly, the carjacking charges against the Petitioner required the government to prove not only that he committed a carjacking and killed Vandergroen, but that he further acted "with intent to cause death or serious bodily harm." See Matos-Quinones, supra, at 18, n. 3. (citing H.R. 4472, § 803(a), 109th Congress, 1st Session (2005)).

In the case at bar, Petitioner was indicted for violating § 2119(3), hence the jury was required to determine whether the "death resulting" element of § 2119(3) had

been proven beyond a reasonable doubt. That is, the court instructed the jury in accordance with law as it existed at the time, however, it did not expressly instruct the jury that Vandergroen's resulting death was an element of the offense charged that the jury was required to determine under the proof-beyond-a-reasonable-doubt standard. In substance, under the statutory interpretation of 18 U.S.C. § 2119, Petitioner was subhected to a sentence not authorized by law on Count Eight of more than 15 years (the maximum term specified in § 2119(1). See Jones, supra.

Intent to Cause Death

Petitioner was convicted of carjacking with intent to cause death or serious bodily harm, resulting in death. Section 2119(3), 18 U.S.C. However, under the misunderstood/ misinterpretation of the statute, the court failed to explain the intent element of § 2119(3) to the jury. Given this proper understanding of the intent element — taken together with the evidence, there is no factual basis for a conviction of § 2119(3). In Holloway v. United States, 526 U.S. 1 (1999), the Court confronted the meaning of the phrase "with the intent to cause death or serious bodily harm" in the carjacking statute. The question in Holloway, was "whether that phrase requires that the

government prove the defendant had an unconditional intent to kill or harm in all events, or whether it merely requires proof of an intent to kill or harm if necessary to effect a carjacking." Id. at 3. The Court answered that question as follows:

> "The specific issue in this case is what sort of evil motive Congress intended to describe when it issued the words 'with the intent to cause death or serious bodily harm'... more precisely, the question is whether a person who points a gun at a driver, having decided to pull the trigger if the driver does not comply with the demand for the car keys, possesses the intent, at that moment, to seriously harm the driver. In our view, the answer to that question does not depend on whether the driver immediately hands over the keys or what the offender decides to do after he gives control over the car. At the relevant moment, the offender plainly does have the forbidden intent."

Id. at 6-7. In short, because this case went to trial, the government had to prove beyond a reasonable doubt the Petitioner (1) took or attempted to take the victim's car through force and violence, or by intimidation, (2) that Petitioner acted with conditional or unconditional intent to cause death or serious bodily harm, and (3) that Petitioner's actions resulted in the death of the victim.

Petitioner has encountered cases (such as this case), where a carjacking defendant(s) accused of stealing a car, taking its driver as a hostage, and later harming

or killing the driver even though he was in control of the vehicle. See e.g. United States v. Lebrion-Cepeda, 324 F.3d 52, 56-57 (1st Cir. 2003)(concerning a defendant who argued that his intent to seriously harm or kill the victim had not developed until after he seized control of the victim's car); United States v. Evans-Garcia, 322 F.3d 110, 112-13 (1st Cir. 2003)(same). In these cases, defendants have suggested that they were not guilty of carjacking because their intent to harm or kill the victim did not exist in the beginning of the carjacking. See Id. at 114. In other words, these defendants contend that they could not be found guilty of carjacking if a jury finds that their intent to kill or seriously harm the driver developed only after the car had been taken.3 /

This interpretation of the carjacking statute stems from the several references in Holloway, as in the quotation above, to the carjacking defendant's intent as of the "moment" of a carjacking. The Court summarized its holding as follows:

> "The intent requirement of § 2119 is satisfied when the government proves that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, if necessary to steal the car.").

Holloway, 526 U.S. at 12 (emphasis added).

3 / As in this case, these cases concern guilty conviction under 18 U.S.C. § 2119(3).

This Court has clearly interpreted the above-quoted language in Holloway, supra, to mean that a defendant is not guilty of carjacking if his intent to kill or seriously harm the driver develos only after he has stolen the driver's car and taken the driver as a hostage. See Rosario-Diaz, 202 F.3d at 63 (For the requirement that the carjacking defendant "intent to cause death or serious bodily harm at the time [he/she] demanded or took control of the murder vehicle"); see also United States v. Harris, 420 F.3d 467, 478 (5th Cir. 2005); and United States v. Applewhaite, 195 F.3d 679, 685 (3rd Cir. 1999)("[T]he statute directs the factfinder's attention to the defendant's state of mind at the precise moment he demanded or took control over the car."). In sum, the facts of this case require this Court today to resolve the question whether the intent element for carjacking was proven beyond a reasonable doubt under both Jones and Holloway, supra, respectively.

## CLOSING STATEMENT

After Petitioner's conviction and sentence, he learned for the first time that under the plain language of 18 U.S.C. § 2119, that any fact that exposes him to a greater potential sentence must be found **by a jury** beyond a reasonable doubt. Thus, only the jury had discretion to impose a mandatory sentence. In addition, the expressed language at the time, the Sixth Amendment inherently required these additional facts to be found by the jury beyond a reasonable doubt, as the Supreme Court made absolutely clear in United States v. Jones, 526 U.S. 227, 233, 252 (1999)(statutory provisions that "not only provide for steeply higher penalties, but condition them on further facts (injury, death), "must be charged by indictment, proven **beyond a reasonabl doubt**, and submitted to a jury for its verdict"); see also id. at 252-53 (Stevens, J., and Scalia, J., concurring("It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt"); accord Cunningham v. California, 127 S.Ct. 856, 864 (2007) ("This Court has repeatedly held that, under the Sixth

Amendment, any fact that exposes a defendant to a greater potential sentence must be found **by a jury**, not a judge, and established **beyond a reasonable doubt** not merely by a preponderance of the evidence")(emphasis added).

It is indisputable the jury did not find the Petitioner acted "with intent to cause death or serious bodily harm" in this case. In fact, the jury was not even asked to consider this essential element. It is unquestionably the government's burden to ensure that the jury find this element if it is seeking a mandatory life sentence.

The Supreme Court repeatedly has stricken down as unconstitutional any attempt by the government to shift the burden on any element or sentencing enhancement to a criminal defendant. See e.g. Mullaney v. Wilbur, 421 U.S. 684 (1975); In Re Winship, 397 U.S. 358 (1970). Therefore, the government took a life sentence off the table when it failed to request a charge instructing that it had to find the element (i.e., "with intent to cause death") beyond a reasonable doubt in order to secure an enhanced sentence of life under 18 U.S.C. § 2119(3).

In sum, under the correct interpretation of the statute (that is, 18 U.S.C. § 2119), the court may not impose a life sentence without a jury finding the additional element beyond a reasonable doubt. To be clear, Petitioner

is not arguing, and has never argued (above), that the Jones, supra, error (i.e., judicial fact-finding) is the basis for the instant petition. Rather, the error was the court's inadvertent but complete usurpation of the jury's authority to decide whether to impose a life sentence, in contravention of the express language of the statute (as opposed to a violation of the inherent constitutional requirements under Jones). And while a Jones error is a serious and intolerable impingement on a defendant's constitutional rights, the fundamental error that occurred here was the court's exercise of discretion that it did not have according to the expressed terms of the statute. Cf. United States v. Prevatte, 16 F.3d 767, 783 (7th Cir. 1996)("[T]he judge may not usurp the function of the jury as defined by Congress...[I]t was **plain error** to impose a life sentence without a jury direction.") The Jones error merely compounds that fundamental error. See also Sullivan v. Louisiana, 508 U.S. 275 (1993)("[A]lthough a judge may direct a verdict for a defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the [government], no matter how overwhelming the evidence"). Here, there is no jury's verdict for a conviction under 18 U.S.C. § 2119(3).

Thus, because all parties here must agree, there is no factual basis for Petitioner's conviction under § 2119(3), it necessary follows inexorably that he has been denied due process of law. Jackson v. Virginia, 443 U.S. 307 (1979). And because the constitutional error (stated above) clearly and concededly resulted in the imposition of an unauthorized sentence, it must therefore follow that Petitioner is a "victim of a miscarriage of justice," Wainwright v. Sykes, 433 U.S. 72 (1977), entitled to immediate and unconditional release.

## CONCLUSION

Every federal court has a special obligation to "satisfy itself of its own jurisdiction in a cause under review." Mitchell v. Maurer, 293 U.S. 237, 244 (1934). Specifically, absent a jury's verdict of "intent to kill or seriously bodily harm", under 18 U.S.C. § 2119(3), this Court does not have statutory jurisdiction over the underlying conviction. Thus, its processes are void and an order of punishment, based thereupon must be reversed; this Court should:

1) Vacate and dismiss the conviction for 18 U.S.C. § 2119(3)(i.e., "death results") and substitute

a conviction under 18 U.S.C. § 2119(1);

2) Set the matter for resentencing on the facts reflecting in the jury's verdict (i.e., the offense of conviction, 18 U.S.C. § 2119(1));

3) Resentence Petitioner under the presumptive sentencing guideline range, U.S.S.G. § 2B3.1 (where a less severe sentence is obvious); and

4) Grant such other relief as this Court deems just and proper.

Respectfully submitted,

Giovanni LARA

Giovanni Lara, pro se,

**DECLARATION**

I, Giovanni Lara, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Giovanni LARA

S I G N A T U R E

# CERTIFICATE OF SERVICE

I, Giovanni Lara, hereby certify that I have served a true and correct copy of the foregoing:

Motion to reopen Case

Which is deemed filed at the time it was delivered to prison authorities for forwarding to the court, Houston vs. Lack, 101 L.Ed.2d 245 (1988), upon the court and parties to litigation and/or his/her attorney(s) of record, by placing same in a sealed, postage prepaid envelope addressed to:

Office of the U.S. Attorney
District of Rhode Island

and deposited same in the United States Postal Mail at the United States Penitentiary,

Signed on this 30 day of MAY, 2007

Respectfully Submitted,

Giovanni Lara
Giovanni Lara, pro-se

REG. NO. 04227-070

# APPENDIX

A. Actually, it's a wire. It's a transmitter. And they have a little suitcase with the tape in it. I took the wire off and gave it back to them.
Q. I want to draw your attention now to a time after you went to prison in the fall, after September 7th of 1994. After you were at -- where were you being held at the A.C.I.?
A. I was being held at the Intake Center. I believe I was in H Mod, Cell 101.
Q. Sometime after you were placed in the Intake Service Center of the A.C.I., did you come into contact with any other Latin Kings?
A. Yes, sir.
Q. Who did you come into contact with?
A. I believe when I got in H Mod, there's a Latin King Nelson who got put down inside prison.
Q. There were Latin King members who were inside prison; is that correct?
A. Yes, sir.
Q. Of all the Latin King members that you came into contact with, is one of the people that you came into contact with Giovanni Lara?
A. Yes, sir.
Q. About how long after you went to the Intake Service Center was it that you came into contact with

Giovanni Lara?

A. I really don't remember. I would say within the first -- within the first month, I would say.

Q. When you came into contact with Giovanni Lara under those circumstances, was he a member of the Latin Kings at that time?

A. Yes, sir.

Q. Were you still pretending to be a member of the Latin Kings at that time?

A. Yes, sir, I was.

Q. Did you talk about things that were going on in the Latin Kings?

A. Yes, sir.

Q. Did one of those conversations involve a murder?

A. Yes, sir, it did.

Q. What did Giovanni Lara tell you --

MR. CICILLINE: Objection.

THE COURT: Step down, please.

(Bench conference held on the record.)

MR. CICILLINE: Judge, this is the part related to the tape of an audiotape that has been marked and this is a Bruton problem.

As I understand the story, Lara is reported to have told Pacheco that he, Lara, and Perry were involved in the murder. It's an

MR. GERSTEIN: Note my objection also.

(End of bench conference)

Q. Mr. Pacheco, what did Giovanni Lara tell you about a murder?

MR. CICILLINE: Objection.

THE COURT: Overruled.

A. He told me that there was a man named Temujin. First he asked me if I knew this guy Temujin.

Q. Did you?

A. No, I did not. And then he told me that Temujin was at -- I believe it's on Fillmore Street -- a house in Chad Brown projects, which is Joey Springer's house.

Q. Is there a name for that house that you know of?

A. Dog Pound.

Q. What did he tell you what happened at the Dog Pound?

A. Told me that Temujin was playing with a knife and scared one of George's daughters or his girlfriend's daughter, I'm not sure which it is. So George and Giovanni discussed robbing him. He had a Ford Escort, but I guess it had nice rims on it.

Q. Did he explain to you why playing with a knife and scaring George's children would result in a robbery?

A. I guess it was a matter of disrespect -- scaring the kid. That was like revenge.
Q. Did he tell you what -- did Giovanni Lara tell you what he and George Perry plotted to do?
A. What they finally did?
Q. What they plotted to do; what they planned to do?
A. They plotted to drive him and rob him and -- but that did not happen.
Q. Did Giovanni Lara tell you about any weapons?
A. Yes, sir.
Q. What did he tell you about a weapon?
A. They told me they brought the single shotgun, which is a 16-gauge. I have had it in my possession. It's sawed-off. It's got a -- single shot. You cock it with a little hammer. And they brought that.
Q. Did he tell you who retrieved that weapon?
A. I believe George Perry had it on him. George Perry carried that before.
Q. How were you familiar with that weapon?
A. I've seen it when George Perry received it.
Q. Was that one of the weapons that you kept when you were Chief Enforcer?
A. No. That wasn't around then. That was bought

after that.

Q. Do you know when that weapon was acquired by the Latin Kings?

A. No. I believe that Terrence Boyd had bought that with another weapon off of someone.

MR. GERSTEIN: Objection. Move to strike.

THE COURT: May be stricken. And the jury will disregard the last answer.

Q. Did Giovanni Lara describe the weapon to you such that you knew which weapon he was talking about?

A. Yes.

Q. What did he tell you happened after they planned to rob Temujin Vandergroen and got a shotgun for that purpose?

A. Giovanni got in the car. He was in the passenger seat. George was, I guess, behind the driver -- was behind Temujin -- in the back seat.

Q. Did he tell you whose car they got into?

A. They got into Temujin's car, which was a Ford Escort.

Q. Did he tell you who was driving?

MR. TODESCO: Objection. Your Honor. Once again, we're leading. It's one thing for Mr. Sullivan to ask questions of the witness --

THE COURT: Back up, Mr. Sullivan.

Q. Tell me what Giovanni Lara told you happened from the point that they retrieved a shotgun to rob Temujin Vandergroen.

THE COURT: Slowly, please, Mr. Pacheco.

A. They got into the car. Giovanni was in the passenger seat. Temujin was driving the car. George was sitting, I guess, behind Temujin -- at least at the time of the shooting he was.

MR. CICILLINE: Objection. He's guessing.

THE COURT: May be stricken. Mr. Pacheco, you can only tell us what Mr. Lara told you, as best you can recall.

A. Okay.

THE COURT: Not what you guess or what you believe.

A. Well, George definitely was in the back seat. And Giovanni definitely was in the passenger seat. And Temujin definitely was driving. They drove and they got towards West River Street or West River Ave., around where the post office and Temujin started slowing down. He was nervous. And George shot him in the back of the head with that shotgun.

Q. Did Giovanni Lara tell you what happened after George Perry murdered Temujin Vandergroen in that car on West River Street?

68

MR. CICILLINE: Objection.

THE COURT: Sustained.

Q. Did he tell you what happened after George Perry shot Temujin Vandergroen?

A. Yes. He said he wiped off a piece of Temujin's brain off of his shoulder, leaned over, grabbed the wheel, opened the door and pushed Temujin out and just kept driving. When he pushed him out, he took the wheel and started driving.

Q. Did he tell you where they went after that incident?

A. They went back to the house on Fillmore. Back to the Dog Pound and they picked up Tony.

Q. Who's Tony?

A. Tony is a Latin King.

Q. Did he tell you anything else about this shooting?

A. Yes. He said they got gas. He didn't tell me where. And they brought the car into Chad Brown projects. Put gasoline inside the interior of the car and set it on fire. And Giovanni, I guess -- or not I guess -- Giovanni told me that George and Tony ran away from the car. Giovanni said he walked away very, very slowly. And somebody said to him, "Hey, the two guys who just burned your car just ran

away." And he said there was a small, like explosion type of sound. There was a sound that came from the car.

Q. Did he tell you anything else about the shooting or the burning of the car?

A. Just the fact that he burned a car. He said that he felt what George did was stupid.

Q. Now after Giovanni Lara told you this account, what did you do with the information?

A. I told Henry I knew who did the murder, over the phone.

Q. And how soon after Giovanni Lara gave you this account did you inform Agent Lescault?

A. I don't remember if it was the same day or not. As soon as I could get to telephone, I did. As soon as I could get to a telephone during A.T.F. business hours.

Q. In order to verify this account, did Agent Lescault ask you to do anything?

A. Well, we met with Providence Police and we told Providence Police what had happened.

Q. And did he then ask you to do something operationally at that point?

A. Yes.

Q. What did he ask you to do?

70

MR. STONE: Objection.

MR. TODESCO: Objection.

MR. STONE: Statement may help refresh his memory. The witness is saying he couldn't hear anything. There's nothing there that's going to help his hearing.

THE COURT: Sustained.

Q. Were you in the presence of George Perry and Giovanni Lara during this time inside the Dog Pound?

A. Yes, sir.

Q. And with the other men that you mentioned?

A. Yes.

Q. And did you see anything unusual inside this room about the appearance of Giovanni Lara and George Perry?

A. George's hoodie (sic), the green hoodie. A hooded sweater.

Q. A hooded sweatshirt?

A. Yeah.

Q. What was unusual about his green-hooded sweatshirt?

A. Had some dark spots and white stuff all over it. And he tossed it to the side.

Q. What were the dark spots?

MR. CORLEY: Objection.

THE COURT: Sustained.

Q. What color were they?

A. Dark brown. Like red, like blood.

Q. Were they wet or dry?

A. Some were moist.

Q. And white stuff?

A. Yes.

Q. Did you ask Mr. Perry about how his sweatshirt came to be that way?

A. They were talking about it.

Q. What did Mr. Perry say how his sweatshirt came to be that way?

MR. CICILLINE: Objection. I thought the witness couldn't hear what was being said.

THE COURT: We'll find out. Overruled. Do you understand the question, Mr. Santi .

THE WITNESS: Yes, ma'am.

THE COURT: Answer it.

A. The conversation was --

MR. CORLEY: Objection.

THE COURT: What did Mr. Perry say?

A. All I heard was that it was brains, brain matter.

MR. TODESCO: Objection. I move to strike. The witness --

A. Murder of Temujin Vandergroen.
Q. Now you were asked a series of questions by the Providence Police, more especially Detective McCaughey?
A. Yes, I was.
Q. And you responded to those questions, did you not?
A. Yes, I did.
Q. And you had an opportunity on prior occasions to read that statement, have you not?
A. Yes, I have.
Q. And you agree that that is the statement which you signed?
A. Yes, I do.
Q. Now did Detective McCaughey ever ask you whether or not you and Giovanni Lara had any conversations prior to your getting into the car that day?
A. Yes, he did.
Q. And did you and Mr. Lara have conversations together before you got into the car?
A. No, we did not.
Q. Was there any prearranged plan between you and Mr. Lara to commit any criminal act on that day?
A. No, there was not.
MR. CICILLINE: That's all.

having trouble understanding you.
A. I said not really.
Q. Now did you decide to rob Temujin Vandergroen before or after you got into the car with him?
A. I really can't recall. It just happened.
Q. But you brought the gun along because you intended to rob him, right?
A. I guess.
THE COURT: Please keep your voice up, Mr. Perry.
Q. So that means that sometime before you got into Temujin Vandergroen's automobile, you decided to rob him because you took your gun along with you, your sawed-off?
A. That gun came with me everywhere I went. No biggie.
Q. What were you going to rob Temujin Vandergroen of?
A. His car.
Q. Why did you want to take Temujin Vandergroen's car?
A. Because I wanted it.
Q. So you got into Temujin Vandergroen's car with your sawed-off by asking him for a ride home, right?
A. I didn't get my gun until I got home.

Q. When you decided that you were going to rob Temujin Vandergroen of his car, did you also decide at that point that you were going to kill him?
A. It just happened, man.
Q. Did Giovanni Lara know that you were going to rob Temujin Vandergroen?
A. No, he did not.
Q. Did he know that you were going to kill him?
A. No, he did not.
Q. So you were going to rob a man that knows you in front of a witness who wasn't part of the plan, is that what you're telling us?
A. Sure.
Q. How did you think you were going to get away with that?
A. He could have got the same thing, too.
Q. What?
A. He could have got the same thing, too.
Q. Who could have?
A. Giovanni Lara.
Q. Your Latin King brother?
A. Sure.
Q. Possibly your Chief Enforcer?
A. I'm not sure what the man was.
Q. What are the Latin King rules about respecting

A. Gas is cheap. Why would I take up a collection?
Q. I'm asking if you did or not.
A. No, I did not.
Q. Who gave you a ride to the gas station to get gas?
A. The gas station is right there.
Q. Did a girl go with you?
A. No, she did not.
Q. Did Joey Springer go with you?
A. I don't know if anybody went with me.
Q. Did Giovanni Lara go with you?
A. No, he did not.
Q. After you got the gas, what did you do with it?
A. I went back to Chad, threw it all in the interior of the car, struck a match.
Q. Who was with you when you did that?
A. Me.
Q. Was Giovanni Lara with you?
A. Nope.
Q. I'm sorry?
A. Nope. Not that I can recall.
Q. And after you lit the car on fire, was there an explosion?
A. Sure there was. What do you think?

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

C.R. NO. 95-75-ML

UNITED STATES OF AMERICA

VS.

GEORGE SEPULVEDA,
TERRENCE BOYD,
SHARIFF A. ROMAN,
GEORGE PERRY,
GIOVANNI LARA and
ERYN VASQUEZ

MARCH 28, 1997
9:00 A.M.

PROVIDENCE, RI

HEARD BEFORE THE HONORABLE MARY M. LISI

DISTRICT JUDGE

(And A Jury)

Court Reporter: Nancy J. O'Rourke, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography



154

told us that you were taking his car because you wanted it, right?
A. Yes.
Q. Now if you only wanted the car, why didn't you take it from him at Chad Brown?
A. I believe I didn't have my gun on me then.
Q. Well, after you got your gun then, why didn't you take it from him at Doyle Avenue?
A. Doyle Avenue is a very busy street.
Q. Did you need to take -- did you need a gun to take the car away from Temujin Vandergroen?
A. I don't know. I mean, I felt I did.
Q. You were there with Giovanni Lara, right?
A. Where?
Q. At Chad and at Doyle Avenue?
A. The man came for a ride.
Q. Don't you think you could have gotten his keys without using a gun?
A. Why would I want to involve somebody in something that I was planning to do?
Q. Something that you were what?
A. Excuse me?
Q. Something that you were planning to do, right?
A. Yes.
Q. Did you ever plan, then, to let

steal it from a stranger?
A. Who knows? I don't.
Q. If you only wanted a car, why take it from a person at all? Why not steal it from the roadside or a parking lot or a driveway?
A. Good question.
Q. And you have no answers right, Mr. Perry?
A. Because I wanted Temujin's car.
Q. Because you wanted to humiliate Temujin, right?
A. I don't see where humiliation fits in this.
Q. Because he had disrespected you, right, Mr. Perry?
A. When?
Q. When he played with a weapon in front of your children.
A. I don't recall him doing so.
Q. And you did it in front of a Latin King brother to prove that you had heart, didn't you?
A. Anyone who knows me knows that I'm far from a coward.
Q. That's why --
A. I don't have to prove nothing to nobody.
Q. That's why you got the nickname "Animal", right?
A. How I got the nickname "Animal"? Don't I look like a "Animal" to you?



154(c)

Q. I'll let the jury decide that, Mr. Perry.

MR. CICILLINE: Objection.

THE COURT: Sustained.

Q. How did you destroy the gun?

A. I beat it with a sledge hammer. And pieces that didn't quite break up, I had to end up sawing them.

Q. And what did you do with it?

A. Just got rid of it.

Q. Where did you do that?

A. Excuse me?

Q. Where did you do that?

A. In the basement of my house.

Q. When did you do that?

A. I believe a day or two -- day or two after.

Q. So a day or two after, you get a sledge hammer and banged on that gun; is that right?

A. Yes.

Q. And anything that was left after that, you cut up with a hacksaw?

A. A saw.

Q. And where did you dispose of it after that?

A. All over.

Q. Do you remember what you told Detective McCaughey about that when you gave a confession to him?

the answer, "I gave it to Giovanni. And he got rid of it." Isn't that what you told him that day?
A. Yes, it is.
Q. And after you told him that, he typed it up, let you read it and you signed it, right?
A. Correct.
Q. So as it relates to Temujin Vandergroen --
A. Excuse me?
Q. You admit you shot Temujin Vandergroen, right?
A. Could you repeat the question?
Q. You admit that you shot Temujin Vandergroen?
A. Yes, I do.
Q. You admit that you shot him while stealing his motor vehicle, right?
A. Yes, I do.
Q. You admit that you used a single-shot, dark-colored, 16-gauge, sawed-off shotgun with a hammer action?
A. I'm not really sure about the color, but I do.
Q. You admit that you were a Latin King on the day of the killing, right?
A. Yes, I do.
Q. You claim you were a soldier on that day; is that correct?
A. That I can remember, yes, I was.



155(a)

going to return to the car?

A. Yes, he was.

Q. By the way, was it your understanding that George Perry was going to return to the car with a weapon?

A. No, it wasn't.

Q. Prior to entering that automobile the evening of September 6, 1994, had you spoken with George Perry about robbing Mr. Vandergroen of his car?

A. No, I hadn't.

Q. Prior to entering that vehicle, had you spoken to Mr. Perry about doing any type of harm of any sort to Temujin Vandergroen?

A. No, I didn't.

Q. Before you got into the car that night, had you spoken with Mr. Perry about Mr. Perry going home to get a weapon?

A. No, I didn't.

Q. There come a point in time when Mr. Perry came and returned to the car where you and Mr. Vandergroen were waiting?

A. Yes, there is.

Q. And describe to us what you saw upon his return.

A. I seen he had a backpack around one shoulder and

wasn't completely stopped.
Q. Mr. Lara, what happened next?
A. Well, I was looking straight ahead and I just heard this loud bang next to my ear, you know. And I felt like fire come by my face. I really didn't know what was going on. So when I felt that, I leaned to the side. My ears were ringing. I didn't know what was going on, you know what I'm saying? When I looked at him, I seen Temujin was shot in the head. I tried to get out the car, you know. I was panicking. I was trying to open up the door, but I guess it was locked, you know.
Q. Why -- did you turn to look at Mr. Perry after this explosion in the car?
A. I looked at Temujin. And then I tried to open the door. When I looked back, I seen Perry getting out of the back seat and pulling Temujin out of the front seat.
Q. In the meantime, as you were trying to open the door -- were you able to open your passenger door?
A. No, I wasn't.
Q. What did you do?
A. I told him, "What the fuck are you doing? Why you do that for?" And he just looked at me and said, "It wasn't meant to be."

Q. Did you make any other attempt to get out of the car?
A. Yeah. The window was rolled down like halfway. So I finished rolling it down to try to jump out the window and he pulled me back. He said, "What are you doing?" I said, I don't want to be around this. I was fucked up. I was screaming, you know what I'm saying? I couldn't understand what happened. He took off fast and went to Chad Brown.
Q. Do you have a recollection of the route you took to get back to Chad?
A. I don't know how -- I don't know how we got there. All I know is we got back to Chad Brown.
Q. What did you do after you got there?
A. We got out of the car and went back to the Dog Pound.
Q. Do you recall where the car was left?
A. I don't know. It was somewhere in the projects. I'm not sure where.
Q. And you and Mr. Perry went back to the Dog Pound, correct?
A. Yes, we did.
Q. When you got there, did you -- this time, did you actually go inside the apartment?
A. Yes, we did.

Q. And do you recall who was there when you got there?
A. I don't know. There was some people in the living room, but we were just going so fast, we went into the next room. There was a bedroom that had like couches in it and went in there.
Q. Were you able to observe George Perry -- how he was acting -- when you went to the Dog Pound?
A. Yes, I was.
Q. How was he acting?
A. He was real pale in the face. He looked like he seen a ghost. He was sweating. And he was real nervous, looking around his shoulder.
Q. How were you feeling when you were at the Dog Pound?
A. I was like in a state of shock. I was trying to figure out what really happened, you know. And I was -- my mind was just blown. There was a million things going through my mind. I really didn't know what to think.
Q. At the Dog Pound, did you tell anybody what you just seen?
A. No, I didn't.
Q. How were your ears feeling at that point?
A. My ears were still ringing.

Q. Were people milling about? You heard Rodney Santi testify that there was conversating going on. Did you see that?
A. I know a couple of people were asking me if I was all right. But I really didn't say nothing to them. I didn't even acknowledge them, you know. I really didn't know what was going on, you know.
Q. Those people then talk to George?
A. I don't know who they talked to. I was like in a state of shock.
Q. What, if anything, did you do after going to the Dog Pound with Perry?
A. I went home.
Q. How did you get home?
A. I walked home.
Q. Were you involved in disposing of the shotgun?
A. No. George told -- he told me if I could take it and get rid of it, and I said, "No. I don't want anything to do with that."
Q. And that was while you were at the Dog Pound?
A. Yes, it was.
Q. Do you know what happened to the shotgun from the Dog Pound?
A. I don't know what he did with it.
Q. As far as the blowing up of the car, were you

involved in that?

A. No, I wasn't.

Q. You weren't there when that happened?

A. No, I wasn't.

Q. From September 6th until you were arrested on the unrelated charge where you were sent to the A.C.I., did you see George Perry?

A. No, I didn't.

Q. Did you talk with him on the telephone?

A. I never saw George Perry again until sometime in '95.

Q. And you saw him at the prison then, right?

A. I seen him in High Security.

Q. Mr. Lara, is George Perry a friend of yours?

A. Yeah. He's my friend.

Q. And did you know him before he became a Latin King?

A. Yes, I did.

Q. How do you feel about George Perry?

MR. CICILLINE: Objection.

THE COURT: Sustained. Mr. Todesco, are you going to be much longer?

MR. TODESCO: I'm moving into another area.

THE COURT: Probably a good time for a

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-12072-RWZ

ALFRED W. TRENKLER

v.

UNITED STATES OF AMERICA

MEMORANDUM OF DECISION AND ORDER

February 20, 2007

ZOBEL, D.J.

In 1994, petitioner Alfred Trenkler ("Trenkler") was sentenced to two concurrent life terms on his 1993 convictions of violations of 18 U.S.C. §§ 844 (d) and (i), receipt of explosives and attempted destruction of property by explosives, as well as conspiracy to violate section 844, 18 U.S.C. § 371. Trenkler now petitions the court for a writ of coram nobis to reopen sentencing in this case in order to correct the imposition of a sentence which, at the time, was available only at the direction of the jury. Both because the petition is unopposed and based on its merits, I grant the writ and order petitioner to be delivered to this court for resentencing.

## I. HISTORY

### A. Conviction and Sentencing

On November 29, 1993, a jury convicted Trenkler of violating 18 U.S.C. § 371 (count 1) and 18 U.S.C. §§ 844(d) and (i) (counts 2 and 3) for his role in the construction and placement of a bomb which exploded, killing one Boston Police

Officer and maiming another. (See Docket 92-cr-10369-RWZ, #487.) On March 8, 1994, he was sentenced to life imprisonment on counts 2 and 3, along with a sixty-month sentence on count 1, the conspiracy charge, all to be served concurrently. At the time, both subsection (d) and (i) of 18 U.S.C. § 844 provided for "imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title" if "death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection." 18 U.S.C. § 844 (1993) (emphasis added). Section 34, in turn, provided for the death penalty or life imprisonment, "if the jury shall in its discretion so direct." Id. at § 34 (1993) (emphasis added). While the court did not have the authority to sentence Trenkler to life imprisonment on the explosives counts under the express language of the statue, neither the government nor defense counsel brought section 34 to the court's attention at the time. Even the U.S. Probation Office, in the Pre-Sentence Report, incorrectly asserted that life imprisonment was an option available to the court.

**B. Amendments to Sentencing Statutes and Post-Conviction Challenges**

Six months after Trenkler was sentenced, Congress amended 18 U.S.C. §§ 844(d) and (i) by striking "as provided in section 34 of this title" and also amended 18 U.S.C. § 34 by striking "if the jury shall in its discretion so direct." See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, §§ 60003(a)(1), 60003(a)(3)(A), 60003(a)(3)(C) (Sept. 13, 1994). Thereafter as amended, section 844 provided for life imprisonment with no reference to section 34, and section

34, as amended, authorized the imposition of life imprisonment without any requirement for a jury trial on the issue.

Shortly after sentencing, on April 12, 1994, Trenkler's trial counsel withdrew and was replaced by new counsel, who handled the appeal. The First Circuit affirmed Trenkler's convictions on July 18, 1995. The life sentence issue was not raised on direct appeal, nor in Trenkler's subsequent legal challenges to his conviction and sentence. These challenges included a December 22, 1995, motion for a new trial, and a January 7, 1999, petition under 28 U.S.C. § 2255 seeking vacation of his conviction for ineffective assistance of counsel, both to this court, and an October 2002 petition for a writ of habeas corpus to the district court in Pennsylvania challenging his sentence on other grounds. All proved unsuccessful.

In 2003, Trenkler read about a similar sentencing error in another case. He contacted his attorneys, who filed a petition for a writ of mandamus in the First Circuit on August 24, 2004. The petition was denied on February 16, 2005, on the ground that to allow it would negate the gatekeeper restrictions on second or successive § 2255 petitions. The Supreme Court denied a writ of certiorari on June 22, 2005.

**C. Instant Petition for Writ of Coram Nobis**

Finally, on December 1, 2005, Trenkler wrote a letter asking this court to rectify the error. (Docket 92-cr-10369-RWZ, #668.) At the request of the court, new counsel reviewed the letter and ultimately filed the instant petition for a writ of coram nobis and

request for appointment of counsel on November 6, 2006.[1] I allowed the motion for appointment of counsel and directed the government to "file a responsive pleading on or before 1/5/07." (Docket, Electronic Order 11/15/2006.) On January 26, 2007, I entered a second order stating that "[u]nless [the government] submits a responsive pleading by February 2, 2007, the court will decide the matter without opposition." (Docket #2.) The government has filed no opposition.

## II. DISCUSSION

The writ of error coram nobis provides a remedy to correct "errors of the most fundamental character" that have occurred in a criminal proceeding. United States v. Morgan, 346 U.S. 502, 512 (1954). The writ is an "extraordinary remedy [available] only under circumstances compelling such action to achieve justice." Id. at 511. "Historically, coram nobis has been justified where errors of fact are raised which have not previously been before the court."[2] United States v. Michaud, 925 F.2d 37, 39 (1st Cir. 1991). "A writ of coram nobis is an appropriate remedy by which the court can correct errors in criminal convictions where other remedies are not available." Korematsu v. United States, 584 F. Supp. 1406, 1411 (N.D. Cal. 1984) (granting the

---

[1] The petition, in the alternative, moves for a writ of audita querela. The common law writ of audita querela provides relief from a judgment based on a legal defense arising after the judgment. United States v. Holder, 936 F.2d 1, 2 (1st Cir. 1991). In this case, the writ of coram nobis is more appropriate, as the sentence imposed was infirm at the time it issued.

[2] There is a split of opinion on whether coram nobis is also available for errors of law. The First Circuit, however, has not limited the availability of coram nobis solely to errors of fact. See United States v. Sawyer, 239 F.3d 31, 35 (1st Cir. 2001).

writ to vacate petitioner's earlier conviction where "much of the evidence upon which petitioner base[d] his motion was not discovered until recently" and the government offered no opposition to the petition).

Here, no other remedy is available to Trenkler. He has already exhausted his right to petition under the writ of habeas corpus. 28 U.S.C. § 2255, as amended in 1996, normally allows a prisoner in custody only a single application to the district court for habeas relief, and even then the motion must be made within one year from the date on which his conviction becomes final. 28 U.S.C. § 2255. Subsequent habeas petitions are strictly limited to (1) newly discovered evidence proving actual innocence, or (2) a new rule of constitutional law retroactive to the petitioner. Id. Even in the rare instances meeting these requirements, the petition must first be approved by the appropriate court of appeals. Id. The First Circuit denied Trenkler's writ of mandamus seeking to vacate his sentences because it did not meet either of these exceptions for a second or successive § 2255 petition. The writ of coram nobis, therefore, is the only procedural mechanism available to him to correct his improper sentence.

This court has jurisdiction to consider Trenkler's petition under the All Writs Act, 28 U.S.C. § 1651.[3] See United States v. Sawyer, 239 F.3d 31, 38 (1st Cir. 2001) (noting that Morgan affirmatively resolved the question whether "coram nobis was still available in federal court for criminal cases"). In order to succeed in his petition, Trenkler must (1) "prove that the error is fundamental to the validity of the judgment,"

[3] 28 U.S.C. § 1651(a) provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

(2) explain his failure to seek relief from judgment earlier, and (3) "demonstrate continuing collateral consequences from the conviction." Sawyer, 239 F.3d at 39.

The First Circuit has, in general, been hostile to the use of the writ where the petitioner merely seeks to retry issues that should have been or actually were decided in an earlier proceeding. See United States v. Barrett, 178 F.3d 34 (1st Cir. 1999) (holding that "while there are very rare circumstances in which review may exist [under the All Writs Act] even if the requirements of § 2255 have not been met," petitioner could not raise an issue under the Act where he had already raised it in his § 2255 reply brief); Michaud, 925 F.2d at 44 (holding petitioner had not demonstrated "fundamental error warranting issuance of a writ of coram nobis" where most of his allegations had already been addressed on appeal); Hager v. United States, 993 F.2d 4, 5 (1st Cir. 1993) (affirming a lower court decision denying the writ, where petitioner was aware of the facts allegedly justifying relief at the time of his guilty plea, yet did not file a timely appeal); Enwonwu v. United States, 199 Fed. Appx. 6 (1st Cir. 2006) (unpublished) (holding a "run-of-the-mill" ineffective assistance of counsel claim, "even if meritorious, is hardly so extraordinary as to warrant coram nobis relief").

In none of these earlier cases was the court presented with a petitioner serving a life sentence imposed in clear violation of federal statute, and who, along with the government and the court, was unaware of the error until after the time period allowing for a normal procedural correction had elapsed. Trenkler's procedural position is more like that of a prisoner who discovers too late evidence to prove actual innocence than that of a petitioner who failed to raise known arguments at the first opportunity and now

seeks another bite of the apple. See Barrett, 178 F.3d at 41 (noting that a prisoner may file a second or successive § 2255 petition if that petition is based on evidence that would establish "actual innocence"). Thus, the instant case presents exactly the sort of extraordinary circumstances in which the writ of coram nobis is appropriate to correct a "fundamental error of law" resulting in a "miscarriage of justice." See Sawyer, 239 F.3d at 45; see also Morgan, 346 U.S. at 512 (explaining that where no other remedy is available and sound reasons exist for the failure to seek earlier relief, coram nobis "must be heard by the federal trial court . . . [o]therwise a wrong may stand uncorrected which the available remedy would right").

**A. The Sentencing Error is Fundamental to the Validity of the Judgment**

There is no question that this court did not have the authority to sentence Trenkler to life imprisonment under the law in effect at the time. Section 34, referenced by section 844, only authorized a life sentence "if the jury shall in its discretion so direct." 18 U.S.C. § 34 (1993) (emphasis added). Other courts interpreting the interaction of these two statutes have come to the same conclusion. United States v. Prevatte, 16 F.3d 767 (7th Cir. 1994) (holding district court committed error in sentencing bomber to life imprisonment for violation of 18 U.S.C. § 844(i) without jury recommendation); United States v. Hansen, 755 F.2d 629, 631 (8th Cir. 1985) ("Absent the recommendation of the jury, this sentence [of life imprisonment for violation of 18 U.S.C. § 844(i)] was improper and must be vacated."); United States v. Gullett, 75 F.3d 941, 950 (4th Cir. 1996) ("Courts interpreting the pre-1994 version of section 34 have held that, under the plain language of section 34, a life sentence may not be imposed

absent jury direction."); United States v. Williams, 775 F.2d 1295, 1299 (5th Cir. 1985) ("[U]nder the clear meaning of the combination of sections 844(i) and 34, Williams may be sentenced by the district court only to 'any term of years' and not to life imprisonment in the absence of a jury recommendation or jury waiver."). Thus, the error by this court in sentencing Trenkler to life imprisonment is directly "fundamental to the validity of the judgment" because it resulted in an invalid sentence. See Prevatte, 16 F.3d at 783 n.16 ([I]mposition of the [life sentence] sentence by the wrong entity is imposition of "an erroneous sentence.")

In Morgan, the Court described the writ of coram nobis as encompassing errors "of the most fundamental character." Morgan, 346 U.S. at 512 (quoting United States v. Mayer, 235 U.S. 55, 69 (1954)). There can be no question that the imposition of an illegal sentence is an error "of the most fundamental character." If the goal of the court is to mete out justice in accordance with the law, a sentence that does not conform to statute, even if inadvertent, is an error most fundamental to the rule of law.

The error is also fundamental because it resulted in an actual miscarriage of justice. In Prevatte, the Seventh Circuit examined the importance of the lower court's error in imposing a life sentence in violation of sections 844 and 34. 16 F.3d at 783 n.16. Because the jury could have determined a life sentence was not warranted, the court concluded that it was "plain error to impose a life sentence without a jury direction." Id. Citing a standard that would reverse for plain error **"only when . . . convinced that it is necessary to avert an actual miscarriage of justice,"** the court nevertheless remanded the case to the district court for resentencing. Id. (internal

quotations removed). Thus, as in Prevatte, resentencing is necessary to correct "an erroneous sentence" and "avert an actual miscarriage of justice." Id.

Finally, the error is fundamental because it violated Trenkler's Eighth Amendment rights.[4] "A sentence that exceeds the statutory maximum has traditionally been viewed as a violation of the eighth amendment's prohibition against cruel and unusual punishment." Ford v. Moore, 296 F.3d 1035, 1038 n.6 (11th Cir. 2002) (quoting Ralph v. Blackburn, 590 F.2d 1335, 1337 (5th Cir.1979)). Here, the maximum allowable penalty without a jury finding was something less than life. Because Trenkler received a sentence that could not be imposed by the court under the relevant statutes, he is imprisoned in violation of his constitutional rights.

**B. Petitioner Could Not Seek Earlier Relief**

Neither this court, nor the government, nor Trenkler were aware of the statutory sentencing limitation at the time he was sentenced, or thereafter, until he discovered the error a decade later. In similar circumstances the First Circuit noted: "Given that even the government seems confused as to the basis for sentencing, we can hardly fault appellant for not raising the issue earlier." Hardy v. United States, 691 F.2d 39, 41-42 (1st Cir. 1982) (finding sufficient cause and prejudice to allow appellant to collaterally attack the lower court's imposition of an unauthorized sentence, even though he had not raised the issue on direct appeal). In that case, the court held that a lesser showing of cause for failing to present the issue earlier is appropriate where the

[4] Petitioner argues that the error is also fundamental because it violated his Fifth Amendment right to due process of law and his Sixth Amendment right to a trial by jury.

district court was without authority to impose the sentence. Id.; see also Suveges v. United States, 7 F.3d 6, 10 (1st Cir. 1993) (suggesting that adequate cause and prejudice to overcome a procedural default existed where the district court lacked authority to impose the sentence given and defense counsel was unaware of the error and therefore did not raise it on direct appeal).

By the time Trenkler's appeal was filed by new counsel, the statutes had been amended and the source of the error buried. As soon as he became aware of the error, he contacted his attorneys and has diligently pursued relief, first by petitioning the First Circuit, and now by the instant petition for coram nobis. Cf. Hager v. United States, 933 F.2d 4, 5 (1st Cir. 1993) (denying a petition for a writ of coram nobis where appellant failed to pursue a timely appeal on an issue known to him at his Rule 11 hearing).

As the First Circuit noted in a similar case remanded for "a simple resentencing" due to an sentence imposed without authority, "[n]one of the evils of a long-delayed retrial such as deaths of witnesses or lapses in memory are present in such a case." Hardy, 691 F.2d at 42. Thus, a lesser showing of cause for the delay in raising the issue is appropriate. Here, there is no attack on Trenkler's convictions that might require a new trial, nor is there any risk that he will go unpunished due to the delay in uncovering the imposition of the illegal sentence. The unusual circumstances of this case provide adequate cause for Trenkler's not seeking relief from this court earlier, and this case, too, calls only for a simple resentencing.

**C. Petitioner Continues to Suffer Collateral Consequences**

Clearly, Trenkler continues to suffer the collateral consequences of the sentencing error. He will likely die in prison while serving the two invalid life sentences imposed by this court. Had the error not occurred, the maximum possible legal sentence would offer him the possibility of leaving prison in his lifetime. See, e.g., United States v. Martin, 63 F.3d 1422, 1434 (7th Cir. 1995) (holding that section 34 required the imposition of a sentence of less than defendant's life expectancy, absent jury direction); United States v. Tocco, 135 F.3d 116, 131 (2d Cir. 1998); Gullett, 75 F.3d at 951.

## III. CONCLUSION

This petition presents the extraordinary circumstances for which the writ of coram nobis provides the only possible relief to avert a miscarriage of justice. Trenkler is imprisoned for life under a sentence not authorized by statute; no other remedies are available, and his petition is unopposed.

Accordingly, Trenkler's petition is GRANTED and the concurrent life sentences imposed by this court on March 8, 1994, will be VACATED. The U.S. Marshal Service shall deliver petitioner to this court on April 4, 2007, at 2:00 p.m. for resentencing.

February 20, 2007 /s/Rya W. Zobel

DATE

RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE