UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

FILED
AUG 13 2007
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

Giovanni Lara,
Petitioner

vs.

UNITED STATES OF AMERICA

C.A. No.: 00-554ML

GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION TO REOPEN AND SUPPLEMENT ORIGINAL FILED MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. §2255

## I. INTRODUCTION

Petitioner Giovanni Lara ("Lara") was convicted after a jury trial and was sentenced to life in prison in October of 1997. Over the past ten years, Lara has attempted to overturn his conviction or reduce his sentence through direct appeal and an exhaustive succession of procedurally abusive post conviction petitions and motions. This newest motion is yet another effort to find a loophole in the process to ask the Court once again to review his conviction or sentence.

Lara's motion is both substantively flawed and attempts an end-run around past post conviction procedure. Although Lara has declared that he is filing his motion pursuant to Federal Rule 60(b), and in the alternative under Writ of Error Coram Nobis, this is really a successive § 2255. Lara must first petition the Court of Appeals to file a second or successive § 2255 with the Court. Perhaps Lara is avoiding that process because he has already attempted it three times and his motions were denied each time. Furthermore, Lara does not meet the prerequisites for a Writ of Error Coram Nobis.

Moreover, the underlying argument in his new motion is flawed. Lara was convicted under the federal carjacking statute as it existed at the time of the offense he committed. The statute has been amended since the date of offense in his case. Lara's statutory and case law arguments are based upon the amended statute and the case law interpretation of the modified statute. Thus, the arguments are not even relevant to his conviction.

The United States therefore requests that Lara's Motion to Reopen and Supplement Original Filed Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 (sometimes referred to herein as the "new motion") be denied.

## II. PROCEDURAL HISTORY

### 1. The Conviction and Direct Appeal

Following a jury trial, Lara was convicted of carjacking, death resulting, in violation of 18 U.S.C. § 2119(3), and witness intimidation in violation of 18 U.S.C. §1512(b)(3) and 18 U.S.C. §2. On October 8, 1997, the Court sentenced Lara to a term of life imprisonment on his carjacking conviction and ten years imprisonment on the conviction for witness intimidation. (Tab 2 p. 24).1

Lara made a timely appeal to the United States Court of Appeals for the First Circuit ("Court of Appeals"). Lara challenged the jury instructions in the appeal. Lara's conviction and sentence were affirmed. United States v. Lara, 181 F.3d 183 (1st Cir. 1999). His sentence became final on November 1, 1999. United States v. Lara, 528 U.S. 979 (1999).

## III. Lara's Original Motion pursuant to 28 U.S.C. § 2255

On November 2, 2000, Lara filed a motion pursuant to 28 U.S.C. § 2255, raising three issues ("Original Motion").(Tab 3 pg. 2). Lara's Original Motion was filed with the clerk one

1 All references to attached documents will designate the appropriate Tab and page.

year and one day after his conviction became final. The certificate of service, however, was dated within the one year deadline. The petition was treated as though timely filed.

On November 27, 2000, the United States filed its objection to Lara's Original Motion. On the same day, Lara filed a motion for extension of time to file a memorandum in support of his § 2255 motion. The motion was granted on November 30, 2000, giving Lara to January 31, 2001, to brief the three issues he had raised. (Tab 3 pg. 2).

On January 31, 2001, Lara filed "PETITIONER'S MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 usc (sic) 2255" (hereinafter the "Memorandum"). The Memorandum addressed seven issues, some of which had not been raised in the Original Motion. On March 19, 2001, Lara filed a pro se motion entitled "MOVANT'S MOTION REQUESTING LEAVE FROM THE COURT TO AMEND AND SUPPLEMENT HIS § 2255 PURSUANT TO FED. R. CIV. P. 15(a), (hereinafter the "Amendment"). (Tab 3 pg. 2). In this Amendment, Lara argued three additional issues not raised in the Original Motion. Although Lara had already challenged jury instructions in his direct appeal, he attacked the instructions from a different angle in these memorandums.

On April 6, 2001, the Government filed an Objection to Lara's Original Motion entitled "GOVERNMENT'S MOTION IN OPPOSITION TO DEFENDANT LARA'S MOTION PURSUANT TO 28 U.S.C. § 2255, TO VACATE, SET ASIDE AND/OR CORRECT SENTENCE." (Tab 3 pg. 2). On May 23, 2001, Petitioner Lara filed a response to the Government's objection, entitled "PETITIONER'S REPLY MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2255." On May 24, 2001, the United States filed a response to Lara's reply memorandum, entitled

"GOVERNMENT'S RESPONSE TO PETITIONER'S REPLY MEMORANDUM." (Tab 3 pg. 3).

On November 19, 2001, the Court ordered that Lara's Amendment be granted in part and denied in part. The Amendment was denied to the extent that Lara sought to add claims that did not satisfy the "relation back" requirements of Fed. R. Civ. P. 15 (c)(2). The Court considered the remaining arguments raised in Lara's Original Motion and denied the motion for reasons set forth in the Court's Memorandum and Order dated December 4, 2001. (Tab 3 pg. 3).

On December 12, 2001, Lara filed a Notice of Appeal with the Court. (Tab 3 pg. 3). On December 19, 2001, Lara appealed the judgment denying his § 2255 motion to the Court of Appeals. (Tab 4 pg. 26). On January 17, 2002, Lara filed a Motion to Amend or Incorporate the Appeal and a Motion for Certificate of Appealability with the Court. (Tab 3 pg. 3). On January 24, 2002, the Court denied the motion for Certificate of Appealability. (Tab 3 pg. 3). On February 11, 2002, the Court of Appeals filed an order denying the Motion for Certificate of Appealability. On May 28, 2002, the Court of Appeals filed a judgment denying Lara's motion for a Certificate of Appealability to appeal from the Court's denial of his § 2255 motion. (Tab 4, pg. 30). Since the final judgment denying Lara's motion to appeal his Original Motion, Lara has filed two requests to file second or successive 28 U.S.C. § 2255 motions.

## IV. Lara's Motion Pursuant to 18 U.S.C. 3582(C) (2) to Modify a Term of Imprisonment

On June 23, 2003, Lara filed a "MOTION TO MODIFY SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(2)." (Tab 2 pg. 31). On September 16, 2003, the United States filed a response to Lara's motion. (Tab 2 pg. 32). On October 2, 2003, Lara filed a reply memorandum to the government's response. On November 26, 2003, the Court denied Lara's motion to modify

his sentence. (Tab 2 pg. 32). On December 5, 2003, Lara filed a Notice of Appeal with the Court. On December 10, 2003, Lara filed an appeal of the District Court's judgment at the U.S. Court of Appeals for the First Circuit. On June 21, 2004, the Court of Appeals affirmed the Court's denial of Lara's motion, for essentially the reasons stated in the Court's Memorandum and Order. (Tab 4, pg. 23).

## V. Lara's Request for Information under the Freedom of Information and Privacy Act and "Notice of Authority"

On August 16, 2004, Lara filed a request for certain information under the Freedom of Information/ Privacy Act. The next day, the Court denied that motion. On March 2, 2005, Lara, along with two co-defendants from his trial, filed a "Notice of Authority", further supporting "petitioners' quest for justice." (Tab 2 pg. 34).

## VI. Lara's Motion for Relief from Judgment Pursuant to Rule 60(b)(4)

On April 12, 2004, while Lara's appeal from judgment denying his 18 U.S.C. § 3582(c)(2) was pending, Lara filed a "MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO RULE 60(B)(4) OF THE FEDERAL RULES OF CIVIL PROCEDURE." (Tab 2 pg. 32). The United States filed an objection, and Lara responded on June 16, 2004. The Court filed a Memorandum and Order, denying the motion, on September 8, 2005. (Tab 3 pg. 5). The Court explained in its Memorandum that the Rule 60(b)(4) motion was procedurally flawed because Rule 60(b)(4) should be used to challenge a civil judgment, and Lara had challenged the underlying criminal conviction. As such, the Court interpreted the motion as another unauthorized attempt to file a successive § 2255 motion. Moreover, the Court noted that even if it did have jurisdiction to hear the motion, the issues raised by Lara were issues he raised on his

direct appeal. Thus, the motion would have been flawed even if it had been brought under the correct statute and procedure. The motion was denied.

### 6. Lara's Motions to File a Second or Successive § 2255 Motion

As previously mentioned, Lara has filed two applications with the Court of Appeals for leave to file a successive § 2255 motion. Lara's first request was filed with the Court of Appeals on July 5, 2005. On July 22, 2005, the Court of Appeals denied the request. (Tab 4 pg. 17).

On September 26, 2005, Lara filed a second application with the Court of Appeals for leave to file a second or successive motion under 28 U.S.C. § 2255. Lara's request was denied by the Court of Appeals on October 13, 2005. (Tab 4 pg. 11).

### 7. Lara's Motion under Rule 59(e)

On September 27, 2005, one day after filing the request for leave to file a successive 28 § 2255 motion, Lara attempted to file a document entitled "Motion to Alter Judgment Pursuant to Federal Rules of Civil Procedure 59(e)" with the Court. (Tab 3 pg. 5). The document was returned to Lara because it lacked certification to opposing counsel.

## VII. Lara's Petition for Writ of Error Coram Nobis pursuant to 28 U.S.C. § 1651 Challenging the Restitution Portion of His Sentence

Lastly, Lara filed a Petition for Writ of Error Coram Nobis pursuant to 28 U.S.C § 1651, challenging the restitution portion of his sentence. That petition was denied by the Court on January 20, 2006. Lara appealed from the Court's decision denying the petition to the U.S. Court of Appeals for the First Circuit on February 22, 2006. (Tab 4 pg. 2). On September 11, 2006, the First Circuit affirmed the Court's judgment denying the petition. (Tab 4 pg. 3).

## VIII. FACTS

### 1. Background: The Latin Kings Organization.

The Almighty Latin King Nation (the "Latin Kings") is a street gang that was founded in Chicago in the 1940s. (Tab 1 pgs. 36-37).2 The Providence chapter of the Latin Kings was formed in the early 1990s. (Tab 1 pg. 38). In the fall of 1994, Sepulveda was the president of the Providence Latin Kings — an elected position known as "Inca" or "First Crown." (Tab 1 pgs. 50-51). Boyd was next in command, holding the position of "Cacique" or "Second Crown." (Tab 1 pgs. 52-53). Roman was third in command as "Chief Enforcer"; his job was to take care of problems, maintain the gang's cache of firearms, and plan "missions" such as robberies. (Tab 1 pg. 61; Tab 1 pgs. 79-80; Tab 1 pgs. 107-108). Tia Barboza was the Secretary, Alex Mesa was the Treasurer, and Vasquez was the Investigator, a job that entailed checking the backgrounds of prospective members and investigating whether current members were violating gang rules. (Tab 1 pgs. 54-56; Tab 1 pgs. 92-93; Tab 1 pg. 112). After Sepulveda fled Rhode Island in January 1995, Boyd was elected to be Inca, Roman became Cacique, and Perry became Chief Enforcer. (Tab 1 pgs. 106, 108-110; Tab 1 pgs. 126-128).

2 Select portions of the trial transcript are apprehended under Tab 1. They are separately paginated for ease of reference. Page references are to the appendix page and not the original trial transcript page.

Latin King members in Providence displayed their gang affiliation in various ways: They wore the gang colors — black and gold — on clothing and beads, they got Latin King tattoos, and they greeted each other with distinctive handshakes, hand signs, and phrases. (Tab 1 pgs. 45-46). Each Latin King had one or more nicknames.[3] Members were required to attend weekly meetings, pay dues, support other members, and follow orders given by the gang leaders. (Tab 1 pgs. 94-97. The "missions" ordered by the leaders could involve running an errand, committing a robbery, or committing a murder. (Tab 1 pg. 43; Tab 1 pg. 105). Members were also required to maintain a strict code of secrecy. (Tab 1 pgs. 48-49; Tab 1 pgs. 160-161). No Latin King business could be discussed with non-gang members or with law enforcement agents. (Tab 1 pgs. 57, 59; Tab 1 pgs. 92-93). Latin King members who violated any rules — from disrespecting another member to "snitching" — were subject to discipline. Depending on the severity of the infraction, the member could receive a fine, a suspension, a "bounce" (a 15-30 second beating by other Latin King members), a "beat-down on sight" (a more severe beating than a bounce), or a "termination" (murder). (Tab 1 pgs. 97-101, 102-104). Only the top three leaders of the Latin Kings (the "crowns") had authority to decide the appropriate punishment and choose who would inflict it. (Tab 1 pgs. 97, 99-100). The trial evidence demonstrated, for example, that when Boyd was Inca, he ordered the termination of Rodney Santi, who was believed to be cooperating with police, and of Jeff Smith, who was thought to be sharing Latin King information with outsiders. (Tab 1 pgs. 58-59).

---

[3] As relevant here, Sepulveda was known as "Paradise" or "Dise"; Boyd was known as "Bullet" or "T"; Roman was known as "Biz"; Perry was known as "Animal"; Lara was known as "G"; and Vasquez was known as "Guy." Tab 1 pgs. 90-91.

**2. <u>The Carjacking and Murder of Temujin Vandergroen</u>.**

Various Latin King members sometimes socialized at the "Dog Pound," an apartment on Fillmore Street in Providence's Chad Brown housing complex. (Tab 1 pg. 65). Eighteen-year-old Temujin Vandergroen also spent time there, although he was not a Latin King. (Tab 1 pgs. 162-163). On one occasion in the Dog Pound, Vandergroen played with a knife in front of Perry's children. (Tab 1 pg. 45). The incident angered Perry, who felt Vandergroen had been disrespectful. (Tab 1 pgs. 65-66; Tab 1 pgs. 129-130). For revenge, Perry and fellow Latin King Lara planned to rob Vandergroen, who owned a 1994 Ford Escort equipped with an expensive stereo and gold wheel rims. (Tab 1 pgs. 42-43; Tab 1 pgs. 23-25; Tab 1 pg. 134).

On the evening of September 6, 1994, Perry and Lara asked Vandergroen to give them a ride in his car. They brought along a 16-gauge sawed-off shotgun. (Tab 1 pg. 67). Lara sat in the front passenger seat, and Perry sat in the back behind Vandergroen. (Tab 1 pg. 68). Perry directed Vandergroen to drive to a desolate area on West River Street in Providence. When Vandergroen slowed the car down at Perry's instruction, Perry shot him once in the back of the head. Perry and Lara then pushed Vandergroen's body out of the car and left it in the middle of the street, where it was discovered a short time later. (Tab 1 pgs. 68-69). They drove Vandergroen's car back to the Dog Pound, where other Latin Kings observed them with blood and brain matter on their clothing. (Tab 1 pgs. 132-133). Lara stated that the shooting was an accident, and that they were only supposed to steal the car rims. (Tab 1 pg. 144). Lara and Perry then used gasoline to set Vandergroen's car afire, and abandoned the car in a parking lot in the Chad Brown complex. (Tab 1 pgs. 69-70).

Lara was arrested on other charges shortly after Vandergroen's murder. Lara encountered fellow Latin King Manuel "Joey" Pacheco in the Intake Center of the Adult Correctional Center ("ACI"), and volunteered the foregoing version of events to Pacheco. (Tab 1 pgs. 63-64, 65-70). In November 1994, Pacheco, who was cooperating with law enforcement agents, was fitted with a body wire and placed in a cell with Lara. (Tab 1 pgs. 70-71). Pacheco then elicited the same confession from Lara again, but the audiotape of their conversation proved to be inaudible. (Tab 1 pgs. 146-147).

Following Perry's arrest on February 25, 1995, he waived his Miranda rights, and signed a written confession.[4] (Tab 1 pgs. 85-88). Perry admitted that he intended to steal Vandergroen's car, and that he pointed a 16-gauge shotgun at Vandergroen's head. He claimed, however, that the gun went off by accident when Vandergroen swung his arm around and hit the gun. Id. Perry also admitted that he gave the murder weapon to Lara to dispose of, and that Perry then "blew up" Vandergroen's car. Id.

**3. The Assault on Joey Pacheco.**

In mid-November, 1994, Sepulveda separately told fellow Latin Kings Mesa and Santi that he wanted Joey Pacheco killed because Pacheco was cooperating with law enforcement. (Tab 1 pgs. 113-114; (Tab 1 pgs. 135-137). At the time, Pacheco was incarcerated in the ACI in Providence. Sepulveda specifically told Santi that Pacheco "needs to be slashed up; dead; dealt with," and that Pacheco should "be sliced up before he said the wrong thing." (Tab 1 pg. 142). Sepulveda instructed Mesa and Santi to deliver a "termination" order to other Latin Kings incarcerated in the ACI. (Tab 1 pg. 113).

[4] Although the government originally offered into evidence a redacted version of Perry's confession that omitted all references to Lara, the unredacted confession was later admitted at the request of Lara's counsel. Tab 1 pgs. 149-150.

On November 19, Mesa, Santi, and Vasquez drove to the ACI together; during the ride, the three men discussed Sepulveda's order. (Tab 1 pg. 114; Tab 1 pg. 140). At the ACI, they signed in to visit Latin Kings Edson Toro, Kareem Abdulla, and Lara. (Tab 1 pg. 115; (Tab 1 pg. 118-120). The six men sat at three adjacent tables in the visitor center; Santi sat across from Toro (Tab 1 pg. 138), Mesa sat across from Abdulla (Tab 1 pg. 116), and Vasquez sat across from Lara (Tab 1 pg. 158). At trial, both Santi and Mesa testified that they delivered Sepulveda's termination order during that visit. (Tab 1 pg. 116; Tab 1 pg. 138-139; Tab 1 pg. 143). Vasquez, however, denied knowing about or conveying to Lara any termination order. (Tab 1 pgs.156-157).

The following night, November 20, 1994, the Latin Kings carried out the order. Lara, Toro, Abdulla, and Latin King Richard Rodriguez approached Pacheco in a poorly-lit corner of the ACI recreation yard. (Tab 1 pgs. 72-73). The four men encircled Pacheco, and Toro asked if Pacheco was a rat. (Tab 1 pg. 74). Either Lara or Abdulla (Pacheco could not see which) then struck Pacheco several times from behind, and Rodriguez cut Pacheco's lip with a metal shank. (Tab 1 pgs. 74-76). Pacheco was struck repeatedly in the back of the head until he fell to the ground. (Tab 1 pg. 76). Pacheco reported the incident to prison officials, and was taken to the hospital where he was treated and kept under observation for about a week. (Tab 1 pgs. 76-77).

When Pacheco was released, he asked to be placed in protective custody. He was put in the prison segregation unit near Lara, Toro, Abdulla, and Rodriguez — all of whom shouted at Pacheco, asking why he had snitched on them. (Tab 1 pg. 77). Shortly after the assault, Lara wrote a letter to Sepulveda in which he reported that he, Abdulla, Toro, and Rodriguez were in the segregation unit. (Tab 1 pg. 170). Lara also wrote: "I think your boy snitched on us. You know who I'm talking about. Niggers could wreck him. He's in Pussy City." (Tab 1 pg. 170).

Lara admitted at trial that he was referring to Pacheco, and that Pussy City was a slang term for protective custody. (Tab 1 pg. 170).

## IX. ARGUMENT

### 1. Issues Raised in Lara's New Motion to Reopen and Supplement His Original 28 U.S.C. § 2255

Lara is attacking the validity of the jury instructions on the carjacking charge. The main focus of Lara's argument is that the jury was not properly instructed on the meaning of intent under the statute. He argues that because the jury instructions were incorrect, the jury did not find Lara guilty of 18 U.S.C. §2119(3), and therefore the Court usurped the jury's power when it sentenced Lara under 18 U.S.C. §2119(3). Lara states in his memorandum that 18 U.S.C. §2119(3) is not a felony-murder statute, and therefore the government had to prove that Lara harbored the requisite intent to cause death or harm. Lara argues that the case law governing the intent element of 18 U.S.C. §2119(3) provides that the defendant must have the intent to kill or seriously injure the victim at the moment he steals the car. Lara cites Holloway v. United States in support of this contention. 526 U.S. 1 (1999). Lara states that the jury instructions lacked this temporal definition of intent. Lara argues that he has been unjustly sentenced and denied due process of law because of this deficiency.

### 2. The Federal Carjacking Statute at the Time of the Offense Did Not Contain a Specific Intent Element

The federal carjacking statute, 18 USC § 2119(3), has been amended since Lara's offense date. On September 6, 1994, the day Lara committed the offense, the statute required only an intentional carjacking while in possession of a firearm. If death resulted from the carjacking, the violator could be sentenced to life in prison or receive the death penalty.

Originally, the federal carjacking statute only applied to carjackings perpetrated with a firearm. Seven days after Lara's offense date, on September 13, 1994, the statute was amended, and the words "with the intent to cause death or seriously bodily harm" were substituted for "possessing a firearm as defined in Section 921 of this statute." Pub.L. 103-322, § 60003(a)(14).

Under the amended statute, federal jurisdiction was extended to any carjacking, regardless of the use of a firearm, so long as the perpetrator harbored at least a contingent intent to cause death or serious harm in order to effect the theft of a motor vehicle. Holloway, upon which Lara relies, examined the amended statute, not the statute under which Lara was convicted. The jury was properly charged under the law as it existed at the time of Lara's offense. Thus, Lara's argument, premised on a later version of the statute, is flawed at its inception. The case law, cited by Lara, interpreting the later version of the statute is inapposite.

**3. Law Governing Motions to Reopen and Supplement Original Motion Under 18 U.S.C. § 2255 Establishes that Lara's Motion is Actually a Successive § 2255 Habeas Petition**

Lara is attempting to reopen his original § 2255 proceeding under Rule 60(b) of the Federal Rules of Civil Procedure. The instant motion cannot be brought under Rule 60(b). In determining whether a petition such as the instant one shall be treated as a successive habeas petition or a motion under Rule 60(b), the First Circuit holds that:

> "a Rule 60(b) motion should be treated as a second or successive habeas petition if-and only if-the factual predicate set forth in support of the motion constitutes a direct challenge to the constitutionality of the underlying conviction. In other cases-cases in which the factual predicate set forth in support of the motion attacks only the manner in which the earlier habeas judgment has been procured-the motion may be adjudicated under the jurisprudence of Rule 60(b)." Rodwell v. Pepe, 324 F.3d 66, 67 (1st Cir. 2003).

Lara is not arguing that the original habeas petition was not properly adjudicated. Lara attacks the constitutionality of his trial, conviction, and sentencing. Therefore, applying Rodwell, the current Motion to Reopen the Original Motion to Vacate should be deemed a second or

successive habeas petition. Successive habeas petitions fall under 28 U.S.C. § 2244. Under the Anti-Effective Death Penalty Act (AEDPA), Lara must obtain an authorization from the Court of Appeals to bring a successive habeas petition to the district court. Lara has attempted to do an end-run around the specified procedure by failing to request authorization from the Court of Appeals.

Further, if Lara had gone directly to the Court of Appeals, it is very unlikely that he would have been granted authorization to file with the district court. Not only is Lara barking up the wrong tree by relying on a version of the statute that was not even in existence on the date of his offense but according to 28 U.S.C. § 2244, the Court will only consider a successive habeas petition under the following circumstances:

> A.) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Finality of Determination, 28 U.S.C.A. § 2244.

Even if his complaint was not fatally flawed in its inception, Lara fails each prong of this test. First, Lara had ample time to discover and raise this issue in his original § 2255. Holloway was decided in March 1999. Lara's conviction was finalized in November 1999. Lara filed his original 28 U.S.C. § 2255 in November 2000, and the supporting memorandums were filed in February and March 2001. Also, Lara could have raised the general issue of intent in his direct appeal, since the statute has included an intent element since 1994. Lara failed to raise the issue of intent until now, ten years after his sentencing and thirteen years after the statute was amended to include an intent element. Further, Holloway has not been declared by the Supreme Court to

be retroactive to cases on collateral review. Lastly, it is unlikely that, had the statute been charged to the jury as Lara is urging it should have been, no reasonable jury would have found defendant guilty of the underlying offense. The facts support conviction under either version of the statute.

Lara improperly attempts to circumvent the gate keeping requirement of the AEDPA by framing his motion as a motion to reopen, or in the alternative, under coram nobis. However, such an attempt must fail. When determining whether a motion has been properly named, the courts should look to the subject-matter of the application, not the label placed on it by the applicant. Chambers v. United States, 106 F.3d 472, 475 (2nd Cir. 1997); Tyler v. United States, 929 F.2d 451, 453 (9th Cir.) cert. denied, 502 U.S. 845 (1991); and Solsona v. Warden, 821 F.2d 1129, 1132 (5th Cir. 1987).

The Third Circuit also held that substance controls over caption. United States v. Lloyd, 398 F.2d 978 (3rd Cir. 2005). In that case, the court put it succinctly,

> "Any motion filed in the District Court that imposed
> The sentence, and substantively within the scope of
> §2255, Paragraph 1, is a motion under §2255, no matter
> what title the prisoner plasters on the cover. Call it a
> motion for a new trial, arrest of judgment, mandamus,
> prohibition, coram nobis, coram obis, audita querela,
> certiorari, capias habeas corpus, ejectment, quare imped
> it, bill of review, write of error, or an application for a
> Get-Out-Of-Jail Card; the name makes no difference.
> It is substance that controls."

Id. At 979-80 (citations omitted).

**4. Lara's Petition Does Not Meet the Prerequisites Under the Law Governing Writs of Error Coram Nobis**

In the alternative, Lara attempts to bring the motion under a Writ of Error Coram Nobis pursuant to 28 U.S.C. §1651. (Lara has already challenged the restitution part of his sentence under this statute, and that motion was denied on January 20, 2006). The Writ of Error Coram Nobis is only available under extreme circumstances. In U.S. v. Barrett, the court stated that, "[t]he writ of coram nobis may not be used to circumvent the clear congressional directive embodied in the 'second or successive' provisions of § 2255, which are themselves a sort of 'timeliness' requirement." 178 F.3d 34, 56 (1st Cir.1999)(quoting *Bennett v. United States*, No. 87 CR 874, 1997 WL 285987, at *2 (N.D.Ill. May 22, 1997)). To determine whether to grant a Writ of Error Coram Nobis, the First Circuit applies a three part test. A petitioner must 1.) explain the failure to seek relief from judgment earlier, 2) demonstrate continuing collateral consequences from the conviction and 3.) prove that the error is fundamental to the validity of the judgment. Lara v. United States of America, 2006 WL 161599 ((quoting United States v. Sawyer, 239 F.3d 31 (1st. Cir. 2001)). Lara fails this test. Lara could have raised Holloway in his original § 2255, or in the supporting motions and amendments filed in early 2001. Lara cannot demonstrate continuing collateral consequences, because Holloway has not been declared retroactive on collateral review. And it is unlikely that the intent charge he now champions more than 13 years after his trial would have changed the outcome in this case.

## X. CONCLUSION

Lara has exhausted every possible avenue to change his conviction and sentence. This new motion is just one of many last ditch efforts. Lara was properly convicted under the statute as it existed at the time of the offense. That conviction and sentence have been exhaustively reviewed. The proper avenue for this motion, which is essentially a successive § 2255, is the

Court of Appeals. In the unlikely event that the Court chooses to consider this motion under a Writ of Error Coram Nobis, Lara does not meet the prerequisites. For the foregoing reasons, the Government requests that this motion be denied.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

GERARD B. SULLIVAN
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
Tel: (401)709-5000
Fax: (401)709-5001
Gerard.sullivan@usdoj.gov

## CERTIFICATION

I hereby certify that on the 13th day of August, 2007 I caused a copy of the foregoing Government's Response to Petitioner's Motion to Reopen and Supplement Original Filed Motion to Vacate Sentence Pursuant to 28 U.S.C. §2255 to be forwarded, by postage prepaid mail, to:

Giovanni Lara
04224-070
U.S. Penitentiary
PO Box 1000
Lewisberg, PA 17837
PRO SE

GERARD B. SULLIVAN
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
Tel: (401)709-5000
Fax: (401)709-5001
Gerard.sullivan@usdoj.gov